November 3, 2011 All right, ladies, when you're ready, don't rush. We'll call number 2260584, Renew Home Health versus NLRB. May it please the court. My name is Amber Rogers, and I represent petitioner Renew Home Health. I'd like to reserve five minutes for rebuttal. As the board held in Oakwood, matching a nurse with a patient may have life and death consequences. Nurses are professionals, not widgets, and may possess different levels of training and specialized skills. While we've raised five different issues on appeal today, I want to focus on two primarily, which is the supervisory status of Ms. Bornschlegel and also why her termination did not violate the National Labor Relations Act. The board's decision, which in this case consists of a single footnote, is the epitome of ignoring portions of the record. Thus, it cannot survive review under the substantial evidence standard of this court. So I want to focus on the supervisory factors that the board ignored. It only talked about one factor, which was a sign, and in that it only gave very limited analysis to the state and federal regulations that govern RN case managers. The board failed to address any record evidence that the RN case managers do assign duties to the LVNs and the home health aides. So specifically, the board here ignored record 51 to 54, which is Ms. Bornschlegel, the charging party's own testimony where she admits that the RN case managers assess patients and they create the plan of care that are then executed and acted upon by the LVNs and the home health aides. Is that final decision-making authority that you're referring to, final, or is it just a recommendation? It's essentially final. The doctor has to sign off on it, but it's the RN case manager who does the assessment of the patient and decides what type of wound care they may need, what the medication, things like that. But the decision is that it's final. But it matters whether it's final or just a recommendation in terms of supervisory authority, right? Well, under the law, you can still be a supervisor if you make a recommendation as long as that recommendation is taken. And the record here bears out that the RN case manager's recommendation is taken. There's no contrary evidence in the record that they recommend who ends up being on the interdisciplinary care team. And, again, the board ignores all of that, but there's no contrary evidence to that. Let me ask you about the structure of RENEW because I had the impression that the – and I'm sorry I don't remember the names – that the people in the office, so to speak, who are above the RNs were not themselves physicians. They were business people. That's right, Judge. So you had COO Chris Well testify, who I believe has a nursing degree. I think he testified about that. Then you have Joanna Ray, who was the director of nursing. You have a branch manager slash agency manager, and then you have some other administrative-type folks who work there, but who are not, you're right, those are not nurses. So having some familiarity with the concept of home health, is it not the case that a doctor is normally the patient's personal physician, and the patient, let's say, has undergone surgery and may need some rehab or may need wound care or catheter care following – well, maybe not surgery, but anyway – following whatever's going on, catheter care, wound care, administration of long-term antibiotics, and so on. And different LVNs have different levels of experience in regard to those particular items of care, don't they? I think that's right. I think the record bears out that you have, you know, amongst this interdisciplinary team, you have the home health aides who I don't believe have to have any sort of licensure. Then you have the LVN, which is a licensed vocational nurse. Then you have a superior level of training and skill who are the RNs. Right. But what I'm saying is that I don't want the business person in the home health organization to assign the LVN for my catheter care. Agreed. I want somebody with medical expertise to assign the LVN who is most capable at doing, let's say, the wound care and the dressing changes. That's exactly right. And it would have helped. I mean, this may have been in the record, but it would have helped, don't you think, if you had put some real simple examples up there for the NLRB? Because I hate to interpolate what I know to be the case into the NLRB findings. Well, I think the record does bear out, though, Judge Jones, that the board conflates and actually just gets wrong that these administrative people that you're referencing are the ones who are assigning. So they basically say that the schedulers who are not LVNs, that they are the ones who are actually assigning the work, and that's not what the record bears out. The record bears out that, again, Ms. Bornschlegel and every other, Mr. Criswell, Ms. Ray, Ms. Thorwald, all testify that it is the RN case managers who are doing this assessment of a patient on the front end, and they are the ones who assign based on evaluating that Nurse Jones is better at ostomy than Judge or Nurse Stewart and putting them onto a case that way. And that's what the record bears out there. And that's record 592 with testimony there that the RNs assess and evaluate the skill set and capabilities that the LVNs and home health aides before putting them on an interdisciplinary team. You have the board ignores that the testimony at record 626 that the LVNs are supervised by the, or consider the RNs their supervisors. You have record 604 testimony that the RNs set basically the parameters for the patient's care, such as what vital signs to look for and what they should be for a patient throughout their care. The board also ignores some other factors other than, again, assigned in a very limited way. It doesn't discuss any of the other supervisory factors. So, for instance, it doesn't discuss discipline, that the record says that the RN case managers can discipline, can give verbal counseling, verbal coaching to the LVNs and the home health aides, and that's at record 584. Why did the NLRB discount the idea that state and federal law both require LVNs and HHAs to be supervised by RNs? I mean, shouldn't that have some importance in the analysis? It should have. You know, had the NLRB correctly analyzed the law, yes, it should have mattered. You know, this court has noted, for instance, in STP nuclear versus NLRB, you had the same there, that you had the board ignores that there were federal regulations under the Nuclear Regulatory Commission there that said the unit and maintenance supervisors had to supervise the reactors there, and the board did the same thing and just basically totally discounted it. And I think what this court held there in STP was it basically is a denigration of their duties to do that. Let me just be clear about what we're actually talking about. I mean, I'm looking at the board decision, but I'm also looking at the ALJ's very specific findings. Aren't we reviewing those for substantial evidence with respect to supervisory staff? Well, if you look at the board's decision, it says it adopts the conclusions and then it footnotes the two, and those are the conclusions I take it to mean that they are adopting. Okay. So we're talking about the ALJ's reasons and whether or not it had substantial evidence to make this finding. I think to the extent the ALJ's decision corresponds with the conclusions the board says it agrees with. You said the board was adopting the ALJ's reasoning? It adopts it at footnote two. Okay. So, I mean, I'm looking at two different things here. The board's very short opinion. It's easy to characterize that as just unreasoned, but I have detailed findings here from the ALJ with respect to supervisory status. Right, and the board is saying we adopt the conclusions. So, therefore, aren't we reviewing that for substantial evidence as to supervisory status? I think you're reviewing to the extent they adopted. They did. At footnote two, which is very limited. Like, that's what they're adopting. Those are the conclusions that the board has adopted. Okay. I see. We're just talking past each other. I see numerous findings here from the ALJ with respect to Bornschlegel's supervisory status and a discussion of evidence, and, right? Right. That's what we're reviewing. Even if you look at what Judge Ringler did, the ALJ, same thing. It still has swaths of evidence, and this court has held you don't get to ignore huge portions of the record and be upheld on a substantial evidence standard. Okay. Where did the ALJ ignore huge swaths of evidence? Just, I mean, you can read the decision. So, for instance, again, it doesn't. No, I'm asking you because you're here more familiar with it than I am, presumably. So, tell me, what are you zeroing in on the ALJ? Where did the ALJ make such an error that was the reverse on substantial evidence? What I've outlined already in terms of assignment, again, those things aren't discussed or analyzed by the ALJ. He ignores, again, I mentioned the discipline. He ignores that the RN case managers participate in hiring panels. He ignores that they, that's in Record 598 and 599. He ignores that they, the testimony in the record that if the RN notes a deficit in treatment of care that an LVN or home health aide gives that they are able to immediately suspend them, and that's at Record 585 and 597. He ignores the secondary indicia, which are Record 1213. Well, it doesn't matter. Substantial evidence doesn't matter on any factor if one factor weighs in your client's favor. Right. I mean, there still has to be substantial, I mean, however you put it. In other words, it's 12-factor tests, and only one factor is sufficient to make the employee a supervisor, right? That's exactly right. We only have to prove one, and we think there's, you know, substantial evidence in the record that was ignored of multiple factors. And then because of time, I want to address Ms. Bournschlagel's termination. And the board here, again, gets, incorrectly finds that she was unlawfully terminated under the National Labor Relations Act. The record is devoid of any evidence of animus toward Ms. Bournschlagel. The record is clear of several things, which is that Gina Anerton came to the employer to complain that her name had been included on this K-mail without her permission, and that she also did not agree to the contents of it. The record's also clear that 10 different nurses had submitted a complaint to the company that they felt they were being threatened with, or just threatened, and raised that as an issue. The company launched an investigation, which is a part of showing that there's no animus. The company investigated these, only asked the questions that were necessary, which is, Did you agree to put your name on it? Did you know what the verbiage was? And then, what are the threats that you allege occurred? That was the entirety of the investigation. The company gave Ms. Bournschlagel an opportunity to explain herself and justify what happened. She opted not to do that. The record is clear that all she said is, I knew what I was doing, and I did it. She never says, again, the judge tries to put this sort of intent standard that's found nowhere in the case law, in board law, or this circuit's law, that she needed some sort of specific intent to falsify a document. But that's not what happened. She doesn't say it was—I'm sorry, Judge, were you about to— Well, I just—there was something in their brief about the fact that the— Ms. Anderton was inherently unbelievable, that she lied, and she'd lied before, and she lied afterwards, and all that. And your briefing doesn't respond to that. Well, I think Ms. Anderton didn't lie. I mean, the ALJ doesn't say anything about that either. So where does that— Right. And I think the record is—the record evidence bears out that Ms. Anderton was not lying and that what this—the board's law and this circuit's law says is that you don't get to sort of act as this judicial second-guesser of things. What Ms.—the records are clear in the K-mails that Ms. Anderton said no less than three times to the company, never changed her story. She was always consistent in saying she went up to the location and complained that day to say, I didn't agree to put my name on there, and I didn't agree to the verbiage. Ms. Wray emailed her later that day to ask to follow up on, hey, you filed this complaint, tell us how this came to be. She again says the same, I didn't agree to it, I didn't put my name on it. She responds back again to another email, says the same thing, I didn't agree to it, I didn't. I never told Ms. Bornschlegel to put my name on there. So there's literally no record evidence that supports that she was untruthful. I think what the record bears out is at the hearing, Ms. Anderton reveals or for the first time realizes, oh, I thought I sent a text message and it didn't go through. The company, again, it is undisputed in the record, every single witness from the CEO, the director of nursing, the director of human resources, the branch manager, all said on the stand, the judge I believe is the one who asked the question, did you know this before? And they all said, no, I never knew that. All I knew was what she told us. Okay. Well, your red light's on. Thank you. Ms. Corquette. May it please the court, my name is Madeline Corquette and I represent the National Labor Relations Board. Substantial evidence supports the board's finding that Renew Home Health unlawfully discharged employee and Bornschlegel when she engaged in protected concerted activity by discussing health, wages, and safety issues with her coworkers at the beginning of the COVID-19 pandemic and emailing those group concerns to management. Renew had the opportunity to demonstrate that it would have terminated her absent her protected conduct, but failed to demonstrate that it would have by a preponderance of the evidence. Contrary to Renew's main defense, Bornschlegel was an employee and not a supervisor because she did not exercise supervisory authority or possess supervisory authority to assign, discipline, or any other of the indicia. The board did not ignore record evidence. Rather, Renew failed to sustain its burden of proving that Bornschlegel was a supervisor by a preponderance of the evidence. Much of their argument to the contrary is based on conclusory, generalized, or discredited testimony. Ultimately, supervisory status issues are a question of fact, and that along with credibility determinations deserve particular deference. Now, in this case, Bornschlegel was a floater RN, and the board found that she did not have supervisory authority to assign, and in the health care context, that means assigning particular patients to specific staff using independent judgment, looking at their skills. So what did she do? She generated the care plan, and this was part of the admissions visit. She asked a series of predetermined questions to figure out what the patients needed. From that, she determined, you know, what care they needed, but she didn't take that next step of matching which staff member would fulfill those duties. Did she know who the LVNs and HHAs were? She worked out of the Fort Worth office, so she might have known some of them. I don't know the extent that she did. What were the requirements of state and federal law with regard to RNs supervising LVNs and HHAs? So the board found that the state and federal law alone cannot determine supervisory status under the NLRA. I find that difficult to understand, but go on. So those state and federal laws might use the term supervisor generally, but just because they use the term supervisor doesn't mean that they supervise under the Act. And in this case, the board followed this court's admonition in STP Nuclear. It considered those regulations and found them insufficient because there was no other evidence of supervisory authority. I didn't see STP Nuclear in the board's decision. No, the board cited Pain Relief Centers, a case that said that regulations alone are not enough to determine supervisory status. Well, it depends on what the regulation says, doesn't it? It does. But even if the regulation might say that they're supervisors, Renews still needed to show that in this case they possessed that supervisory authority and they were assigning specific staff to particular patients. As I say, playing this out on the basis of experience about home health care, you've got a patient with an ostomy or a patient who needs wound dressing, and the RN visits that patient and ascertains what the care needs are. Then the RN goes back and you're saying the most the RN can do is put a report in front of the business people and then the business people assign the LVN. So the business people, I think you're referring to sort of the upper management. Right. We have COO Criswell. We have the director of nursing, the branch manager. They were all nurses in and of themselves, and the branch manager as well as the schedulers were the ones who actually did that matching and figured out how an LVN schedule would look for the day which patients he or she would see. Renew did not present any documentary evidence or testimony from rank-and-file employees showing that they're the ones doing that specific matching. Well, the point is whether you have the authority, not whether you exercise it. Certainly. But you still have to show that that authority actually exists. And I'm just going off what the brief said, not the record. If Bournschlagel says that RNs can assign LVNs, why isn't that material? I believe that she said RNs do not assign, that they generate care plans, but they don't do that next step of matching. There wasn't any, for example, there wasn't documentary evidence such as files showing LVNX is particularly good at wound care. Well, you know, not every employer in the United States keeps documents of every single thing they do because they may get sued by the NLRB. So really the testimony means a lot. And the absence of documentation, I think, is red herring. But I'm just trying to ferret out what the record says about this matter of the ability of RNs to assign. Yes, and RNs do not, while they generate a care plan, they do not have the ability to assign an LVN. And I similarly said RNs do not assign to us. We receive our assignments from the schedulers. That is backed up by, I believe, both LVN Anderton as well as LVN Moore. So the record does show that these assignments are not coming from the RNs in terms of the matching. They're generating the care plan, but they're not doing the matching. So, additionally, the board found that RNs Suppose Renu had been sued for medical malpractice. And let's suppose that a catheter had gotten infected and sepsis had happened and the patient was direly ill. And the problem was that the RN assigned to that patient said, this patient needs a particular person with skill in catheters, but that's all that the RN did. And then the business manager and the scheduler assigned some new person who had no experience with catheters and the worst happened. That wouldn't look very good from a liability perspective, would it? That may not. But in that case, the RN would not have assigned with supervisory authority and independent judgment because although in your hypothetical she might have recommended, this LVN is particularly good at catheters. No. Your position is it didn't matter whether she recommended it or not. The decision's made at a higher level. So the RN's input is not material. And, of course, that would come out because, after all, we've just been sanctioned by the NLRB. So our position is that RNs do not assign. They don't recommend assignment. They just generate the care plan which says, this patient needs these services. So what I'm saying is what the NLRB decides could be totally at odds with the responsibilities that they have under state and federal law to give the best care to the patient. Shouldn't the law all move in one direction rather than being cross-purposes? So I don't think that I might be misunderstanding here, but that a state or federal law says that someone is a supervisor, that may be, but that doesn't mean that they're supervisors under the NLRA because they don't exercise supervisory authority with independent judgment. To be clear, the people that the ALJ found were exercising independent judgment, Criswell and others, they are medical professionals, right? They are nurses, yes. They're not just some bean counter sitting in an office somewhere. No. They have their own training as medical professionals. That's correct. It's just a question of fact about whether this floater RN was exercising supervisory authority. That's correct, and here she was not. Additionally, she did not exercise authority to discipline. For a disciplinary authority to exist, they have to exercise authority and discipline or effectively recommend discipline, and that discipline has to lead to personnel actions without independent investigation from management. Here, the RNs at most reported incidents to upper management for them to then take the next step. Additionally, simply bringing an issue of substandard performance or issuing a warning that does not lead to further discipline is not enough to be considered disciplinary authority under the Act. All right. You may have more to say on that. I mean, I wanted to ask you about the idea of a workplace rule because your client found that here there was a general workplace rule, and my difficulty with that is that what the record looks like here is an instruction to an individual employee and not a general workplace rule, and I just have a difficulty with that. Sure. So under Teachers AFT New Mexico, there are two ways you get to a rule. One is you have an employee who tells another employee, this happened, there's this new rule, something along those lines. You also can get to a workplace rule when something would reasonably be construed as establishing a new rule or policy for all employees, and here the board found that renews consistent course of conduct over eight months where they reiterated this rule that employees could not talk to each other about these group concerns. They instead need to bring it directly to management. They reiterated that three times from two different managers over the course of eight months. To whom? To whom did they reiterate that? So they reiterated it to Borch Legal. To anyone else? They did mention at the end of the case conference on April 16th that people should bring concerns directly, That is not an intimidation saying, well, please be sure to let us know, right? How can that be an adverse rule? So it's looking at the totality of the circumstances from an employee's perspective. An employee might pick up on things that we as separate individuals outside of the context might not consider, and a reasonable employee in Borch Legal's position would look at these three reiterations coming from two different supervisors and think, hey, yeah. This obviously didn't intimidate Borch Legal because those occurred before she sent out the message signed by numerous employees, right? Some of them did, but some of them occurred after she sent it out during her termination meeting. And whether or not an employee is actually coerced is not indicative of whether. So Borch Legal was coerced, but not so much that she was disincentivized to file that memo. So the question is whether a reasonable employee in Borch Legal's position would have been coerced. That Borch Legal was or was not coerced is not the question. It's kind of zooming back out and looking at a reasonable employee in that. I thought there was a Fifth Circuit case. You can't have a workplace rule that's only known to one employee. Under board law, you can have a workplace rule if it's . . . Yes, but the Fifth Circuit overcomes board law. I thought there was a Fifth Circuit case about that. I apologize, Your Honor. I'm not sure . . . Well, maybe it's my error. I could be just misremembering. I'm not familiar which case you're speaking of, but I'd be happy to submit a letter after addressing it. Even if . . . suppose we disagreed with the board that there is a general workplace rule here, and instead there's an individualized instruction to one employee that doesn't amount to a general workplace rule. Is there a path for us still to enforce the board's order? There is, because the board found that Renew Home Health unlawfully discharged Ann Borch Legal in violation of the act. So this court may determine there wasn't a workplace rule. That 8A1 violation is not enforced, but the other 8A1 violations, the discharge could still be upheld. So that is . . . If you could make that argument, please, so that I could hear it. The argument that doesn't depend on finding this as a general workplace rule, but . . . So take that off the table. Sure. Why should we then enforce the board's order? You should enforce the board's order because Borch Legal was unlawfully discharged for engaging in protected concerted activity. She engaged in that protected concerted activity when she spoke to her coworkers, sent the email to management. Management knew of it because they received that email, and then they terminated her for that protected conduct. So that is direct evidence of animus that she was terminated for engaging in protected concerted activity. And under RELCO, which is an Eighth Circuit case, when the employer admits their motivation encompasses the protected concerted activity, they've effectively admitted to an NLRA violation. And this circuit also looked at Brown and Root, and there, two employees were terminated in the course of engaging in protected concerted activity. I believe it was raining outside, and they refused . . . they stopped working, and they refused to go back to work, and then they were ultimately terminated. So, likewise, Borch Legal was terminated for her protected conduct and renewed . . . to be on the K-mail. Wasn't that an independent reason to discharge her? So, the employer must show not that it just could have discharged her for some other reason. They have to show that they would have discharged her for this other issue of falsification. And the board found that they did not sustain their rebuttal burden of proving that based on their . . . terminating employees for falsifying patient medical records, time records, had no bearing on whether an employer would terminate an employee for engaging in protected activity and including an employee's name on an internal e-mail without their permission. And the differences between these comparators are important. And under Remington, the board is entitled to consider those differences. And they ultimately determined that Renu did not sustain its burden of showing that it would have discharged her absent this protected conduct because it all relates back to the e-mail. She was terminated for the e-mail, which was protected conduct. In the board's view, can an employer ever discipline an employee because it has an individualized disciplinary plan that says you must bring your concerns to management and not coworkers? Is that ever legal in the board's view? I think if I understand what you're asking, a general rule that employees can't talk to each other, they have to just talk to management, that's unlawful. Not a general rule, but one employee that's . . . I mean, it sounds like, reading between the lines here, it's like this employee could be disruptive in the way that she brought up concerns, I suppose, impacted morale. I don't know. I don't remember what they said. Is it ever okay for there to be an individualized plan for this employee that says, look, if you have a problem, come to management. Don't go to your coworkers. That causes problems. Is that ever okay? So even if that's not a rule, that's still an unlawful statement because they're telling her, you can't talk to other employees, which she can under the National Labor Relations Act, and then they're acting on that unlawful statement to terminate her. So it sounds like no. No. I'm looking at the last pages of the appellant's brief where they point out there's a distinction between work rules and instructions. The board cites no authority supporting the conclusion that something is a work rule if it only goes to one employee. Bornschlegel. So the law that we're pointing to is Teachers AFT New Mexico, which is that a statement that could reasonably be construed as establishing a work rule, even if, you know, necessarily given to one person, that could still . . . But if it only goes to one employee, that's an unreasonable extrapolation, isn't it? It's looking at the totality of the circumstances from the employee's perspective. Would they reasonably understand these statements, this repeated course of conduct, as establishing that there is a work rule, that they can't speak to others? And that's what happened in this case. I see my time has just run up.  Okay, thank you. Ms. Rodgers, rebuttal. I'll just focus on a few points. One, the record evidence is clear, yet ignored, that regarding the work rule, Carrie Moore, who is a licensed vocational nurse, I believe, and then Gina Anderton also testified. I believe she's also a LVN. That they never knew about Ms. Bornschlegel's previous discipline. That is what the board is alleging is a rule. Ms. Bornschlegel testified that she never told anyone about the discipline. She never showed it to anyone. Every other witness who participated in that disciplinary action on the management side testified to the same. The law here is clear. That's an instruction, not a work rule. And, you know, you can't make the leap to say that some reasonable employee could believe that when every other employee says they never knew about it. And then regarding Ms. Bornschlegel's termination, counsel just said that there is no evidence that the company otherwise would have terminated her. But the board's law is clear that you can have a first instance of discipline or misconduct occur and discipline a person. The record is clear that every other person, and it's uncontroverted, and even the board's order doesn't dispute it. They just try to distinguish the types of falsification that people were terminated for. But there is no contrary evidence. Ms. Bornschlegel herself says, I am unaware of, in my decade-long history here, any person falsifying a document and keeping their job. Every other witness testified to the same thing. And that's what the record. I'm looking at the ALJ's findings here, and it's much more nuanced than, well, I falsified a document and I'm not aware of anybody else ever not being fired for that. There's all kinds of nuance about what actually happened here with respect to Anderton and whether Bornschlegel just made a mistake about assuming that she consented. I mean, that's a finding from the ALJ. But there is. Is it not? But you can't make a finding based on no evidence. She never told the company she made a mistake. I don't believe there's record evidence of her saying it was a mistake. What you have is I sent a text message or in the draft came out to a person. I sent it to you, Judge Duncan, saying, hey, I want to send this thing to our bosses. Do you agree to it? You do not respond because you are here on a panel working, and I just send it off on your behalf, signing your name, representing to your employer that you both agreed to sign it and that you agreed to the content. That's not a mistake. And I think, again, that's ignoring the record evidence of Ms. It's not the circumstances of that. I'm reading the ALJ's Anderson failed to follow up, and Warren Schlegel unfortunately failed to make further inquiry and errantly assumed consent. And there's citations to exhibits and everything. So, I mean, there's evidence that the ALJ is making a finding with respect to this particular thing and whether it would have justified discharge. But that's because he's basing it on, in the record shows, he says, I look at this as an act of intent. That's not – there's no case law. The board doesn't have that standard. This court doesn't have a standard of intent. It is what you're looking at is what did the employer know at the time. And you have, again, you don't get to have a person not respond and then take that as consent. Yeah, not court. I mean, that's not – You're saying that's a – is that a fact or is that a legal – That's the falsification of something is that if you're – You're just arguing the facts. We're not refinding facts on an appeal, on a substantial evidence review from a – But those are the facts. That, like, the fact is that she texted her co-worker and said a few things that, again, gets ignored. I will not send this until everyone agrees. Ms. Anderton never responded agreeing. Then there's the claim that Anderton lied. Though Anderton admitted at the hearing that she never expressed her rejected Born Schlegel and was silent, she nevertheless lied to Criswell and Wray during the course of their workplace investigation and fraudulently claimed that she told Born Schlegel no thanks. Those are facts that come out at a hearing a year later. What you have at the time that this discipline happens is an employer who investigates, goes to an employee and says, Ms. Born Schlegel, your co-worker is alleging you did not have her permission to do this. Ms. Born Schlegel never says, no, no, here's the text message that she either didn't respond to or here's the text message that she did respond to. She just says, and again the record is undisputed on this, that she says, I knew what I was doing and it was just one person. That's not a mistake. And then she goes out and tells her friend that she was fired because Anderton didn't sign. Exactly. She knew what she did, and I can just give, if you can indulge me for 30 seconds, an example that if your law clerk sends you a text right now that says, Judge Duncan, I'm going to go to the chief judge with our list of complaints that you have about them, the workplace, that we have to come back five days a week, everything like that, you do not respond. They send it to the chief judge saying you agree to these things because I've signed your name onto it. Is the fact that you were working and did not respond to it, is that your consent? Or did your law clerk falsify a document? I don't know. You need an investigation. I think your law clerk is going to end up getting in trouble. Well, that's interesting. You need to investigate which was done. You would investigate, and then if they didn't deny it, which happens here, you would believe. We're not here on de novo. I mean, I think that law clerk wouldn't have a job anymore.